## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **No. 3:11-cr-252 (VLB)** |
| | : | |
| **JUAN CARLOS MELENDEZ** | : | |
| **Defendant.** | : | **May 6, 2021** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

### MEMORANDUM OF DECISION DENYING DEFENDANT JUAN CARLOS MELENDEZ'S MOTION FOR A REDUCTION OF SENTENCE, [Dkts. 102, 105]

Before the Court is Defendant Juan Carlos Melendez's motion for a reduction of his sentence to provide for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). [Dkts. 96, 105]. In April 2012, Mr. Melendez pled guilty to one count of Receipt of Child Pornography, in violation of 18 U.S.C. § 2552(a)(2). [Dkt. 42 (Change of Plea Hr'g)]. In October 2012, the Court sentenced Mr. Melendez to 168-months imprisonment to be followed by lifetime supervised release. [Dkt. 80 (Crim. Judgment)].

Mr. Melendez seeks a modification of his sentence from incarceration to home confinement based on his asserted risk of severe complications should he become infected by COVID-19 while incarcerated at a Bureau of Prison's ("BOP") contracted facility. [Dkt. 105, 112]. Mr. Melendez is currently incarcerated at Giles W. Dalby Correctional Institution and is scheduled for release on November 07, 2022. *See Inmate Locator Service, BOP Registration no.* 20217-014, Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/, (Apr. 28, 2021). The Government

opposes Defendant's motion. [Dkt. 108 (Gov. Mem. in Opp'n)]. For reasons set forth below, the Court DENIES Defendant's motion.

Background

### A. Procedural history

In August 2009, FBI agents downloaded 82 images depicting child pornography offered for download on a peer-to-peer file sharing network. [Dkt. 50 (Pre-Sentence Investigation Report) ¶ 7]. [1] The images included penetration of infants and toddlers by adult males. [*Id.*]. The FBI traced the IP address associated with the username and directory and learned that it was assigned to Mr. Melendez. [PSR ¶ 8]. Based on this information, the FBI obtained and executed a search warrant on Mr. Melendez's residence. [PSR ¶¶ 9-15].

A forensic examination of the hard drives seized revealed over 24,000 images of child pornography. [PSR ¶ 15]. Between 100 and 200 of the images and videos involved bondage, sadistic, and/or masochistic activity. [*Id.*]. Mr. Melendez took steps to organize the material into categories, put labels on them to make them more attractive, and traded them to others for additional images of child pornography, thereby commercializing his conduct. [PSR ¶¶ 11, 17]; [Sent. Hr'g Tr. at 39:24-40:16].

At sentencing, the Court found that Mr. Melendez was at risk of recidivism because he "lacks insight, understanding of the horrific nature and impact of his

---

[1] At sentencing, the Court confirmed that Mr. Melendez was interviewed by the U.S. Probation Office in the presence of his counsel, that that he reviewed the pre-sentence investigation report, and he did not have any objections. [Dkt. 87 (Sent. Hr'g Tr.) at 2:14-4:04]. The Court adopted the presentence investigation report as its findings of fact. [*Id.* at 4:08-04:12].

2

conduct, and until that insight is achieved, recovery cannot even be hoped for..."
[Sent. Hr'g Tr. at 39:11-39:15]. Mr. Melendez claimed that he was a victim of sexual
abuse, so he should have been aware of the devastating impact sexual abuse has
on child victims. [*Id.* at 38:22-39:03].

The parties' stipulated that the advisory U.S. Sentencing Commission
guidelines recommended a 210 to 262-month sentence, but that the statutory
maximum was 240 months. *See* [Dkt. 43 (Plea Agreement) at 9]. The Court declined
to impose a two-level enhancement for use of a computer pursuant to USSG
§2G2.2(b)(6) because use of a computer is axiomatic in nearly all modern child
pornography cases. [Sent. Hr'g Tr. at 40:22-41:03]. Based on that ruling, the Court
determined that the sentencing guidelines recommended a sentence between 168
months to 210 months imprisonment. [Sent. Hr'g Tr. at 41:04-41:10]. Taking all of
the § 3553(a) sentencing factors into account, in particular, the need to protect the
public, the Court sentenced Mr. Melendez to 168 months imprisonment to be
followed by lifetime supervised release if he is not deported. [*Id.* at 39:16-39:23;
41:16-41:22]. Because of Mr. Melendez's significant medical history, to wit, mobility
difficulties attendant to childhood polio and depression with suicidality, the Court
recommended that the BOP house him in a medical facility. [*Id.* at 42:20-42:23];
[PSR ¶¶ 60-63, 74].

Mr. Melendez appealed his sentence, arguing that it was substantively
unreasonable. *See United States v. Melendez*, 551 F. App'x 20 (2d Cir. 2014). The
Second Circuit affirmed the judgment, noting that "[t]he district court found that
Melendez showed little remorse for his actions and that he was likely to reoffend if

he were released. The court also found that Melendez was more than a mere passive recipient of his contraband, unlike other child pornography defendants who had received more lenient sentences." *Id.* at 20-21.

Thereafter, in December 2016, Mr. Melendez filed a pro se motion for a reduction in his sentence pursuant to 18 U.S.C. § 3582(c). [Dkt. 90]. The Court denied his motion because Amendment 801 to the sentencing commission guidelines was not retroactive and the five-level enhancement pursuant to USSG §2G2.2(b)(3)(B) would still apply because he distributed child pornography in a bargained for exchange. [Dkt. 92 (Mem. of Decision) at 4-6]. Finally, the Court found that the "Defendant has not demonstrated an entitlement to a reduction based on his fine adjustment to prison life; however, such behavior is admirable and the Bureau of Prisons is in the best position and has the ability to evaluate and reward him for his behavior." [*Id.* at 7].

The Second Circuit dismissed Mr. Melendez's *pro se* appeal of that decision as lacking an arguable basis in fact or law. *See* [Dkt. 95 (*United States v. Melendez*, 17-4016 (2d Cir. May 31, 2019)].

### B. Defendant's Motion for Compassionate Release

On December 9, 2020, Mr. Melendez filed a *pro se* motion seeking a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) to provide for his compassionate release. [Dkt. 96 (Def. Mot. for Compassionate Release)]. He argued that the conditions at the D. Ray James Correctional Facility constituted willful deliberate indifference to serious medical needs. He claimed that the staff refused to sanitize and clean the ventilation units or to use HEPA filters. [*Id.* at 1]. Mr.

Melendez asserts that he is susceptible to severe illness or death if he contracts COVID-19 because he has hypertension and he is unable to walk. [*Id.*]. According to his motion, he will be deported to Peru upon his release from BOP custody and he would live with his grandparents there. [*Id.* at 2].

Thereafter, the Court appointed counsel to represent Mr. Melendez in accordance with the District's General Order. *See* [Dkt. 100 (Notice of Appearance)]; D. Conn. General Order Appointing Counsel (Apr. 7, 2020). On December 21, 2020, Mr. Melendez filed a notice indicating that he was transferred to Reeves III CI in Pecos, Texas. [Dkt. 101 (Notice of Change of Address)].

Defendant's counsel's supplemental motion argues that extraordinary and compelling reasons exist to reduce Mr. Melendez's sentence because: (a) the growing COVID-19 pandemic has made Mr. Melendez's sentence much more punitive than intended; (b) Mr. Melendez's medical conditions, including hypertensive heart disease, render him especially vulnerable to serious illness or death if infected with COVID-19; (c) his extraordinary rehabilitation; and (d) the 18 U.S.C. § 3553(a) sentencing factors as applied to this case and his current circumstances. [Dkt. 105 (Def. Suppl. Mem.)].

In opposition, the Government argues that Mr. Melendez fails to show extraordinary or compelling reasons to reduce his sentence because he does not have a condition that the CDC recognizes as rendering him especially susceptible to an adverse medical outcome from COVID-19. [Dkt. 108 (Gov. Mem. in Opp'n) at 10-12]. The Government argues that Mr. Melendez remains a danger to society based on his offense conduct and that he fails to present a release plan. [*Id.* at 13-

5

15].

In reply, Mr. Melendez submitted an affidavit indicating that he does not intend to contest deportation to Peru and that he aspires to work as a graphic designer there. [Dkt. 112 Def. Repl., Ex. A (Melendez Aff.) at 1-2]. Mr. Melendez states that he was not eligible for sex offender rehabilitation programs while incarcerated at a BOP facility and then he was transferred to a private prison that does not offer these programs. [*Id.* at 3]. Mr. Melendez feels that his sentence has made him a remorseful person and that he regrets what his family and victims went through. [*Id.* at 3-4]. He states that, notwithstanding BOP's policy implementing COVID-19 precautions, "a handful of staff either don't wear their masks properly or at times don't wear them at all." [*Id.* at 5].

<u>Discussion</u>

A. <u>Legal Standard</u>

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed'; but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011) (citations omitted) (quoting 18 U.S.C. § 3582(c)). The statute codifying the rule of finality states:

> [T]he court ... upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with

6

applicable policy statements issued by the Sentencing Commission[.] 18 U.S.C. § 3582(c)(1)(A).

The specific provision under which Defendant seeks relief from his sentence, the First Step Act of 2018 (as amended), imposes procedural prerequisites to filing a motion for resentencing to provide compassionate release. First Step Act of 2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)). Previously, only the Bureau of Prisons ("BOP") could move for compassionate release and such motions were rarely filed. *United States v. Brooker*, 976 F.3d 228, 231-32 (2d Cir. 2020). The First Step Act amendments were intended to address past inaction by the BOP by removing it as the sole arbiter of compassionate release, while still permitting the BOP to weigh-in on a defendant's request via the statute's exhaustion of administrative remedies requirement. See *id*. at 232; *see also United States v. Gamble*, No. 3:18-CR-0022-4(VLB), 2020 WL 1955338, at *3 (D. Conn. Apr. 23, 2020)(explaining the policy purpose behind the exhaustion requirement in this context), *aff'd on other grounds, United States v. Butler*, No. 20-1379-CR, 2021 WL 1166001 (2d Cir. Mar. 29, 2021).

In *Brooker*, the Second Circuit held that since the BOP no longer has exclusive authority to bring a motion for compassionate release, district courts have the discretion to determine what constitutes "extraordinary and compelling" circumstances outside of the outdated U.S. Sentencing Commission policy statements when the defendant moves for compassionate release. 976 F. 3d at 234-36. In short, the statute only requires courts to consider "applicable" statements

issued by the U.S. Sentencing Commission and the relevant policy statement, U.S.S.G. § 1B1.13, is no longer "applicable" because the policy statement refers exclusively to a motion brought by the Director of the BOP. *Id.* at 235-36. In other words, "[w]hen the BOP fails to act, Congress made the courts the decision maker as to compassionate release." *Id.* at 236. Therefore, courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release," and not just those delineated by the U.S. Sentencing Commission's policy statement. *Id.* at 237.

Consequently, the Court may grant a Defendant's motion for compassionate release if: (1) the Defendant has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the warden, and (2) the Court finds that, after considering the Section 3553(a) factors, that "extraordinary and compelling reasons warrant" a reduction of his term of imprisonment.

The defendant bears the burden of proving that he is entitled to a sentence reduction. *United States v. Gagne*, 451 F. Supp. 3d 230, 234 (D. Conn. 2020). The district courts have broad discretion in deciding whether to grant or deny a motion for compassionate release. *United States v. Gileno*, 448 F. Supp. 3d 183, 186 (D. Conn. 2020); *see also* § 3582(c)(1)(A) ("[T]he court…*may* reduce the term of imprisonment...")(emphasis added).

### B. Whether Mr. Melendez exhausted administrative remedies

Pursuant to 18 U.S.C. § 3582(c)(1)(A), a defendant must either "…fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf <u>or</u> the lapse of 30 days from the receipt of

8

such a request by the warden of the defendant's facility, whichever is earlier." (emphasis added). Thus, a defendant need not exhaust all available administrative appeals of the warden's denial of the request, so long as defendant waits thirty days before seeking judicial relief.

Mr. Melendez submitted an inmate request to the warden on October 20, 2020 to follow up on a June 2020 request for consideration for compassionate release. [Dkt. 107, Def. Ex. C]. The facility administrator at D. Ray James Correctional Facility denied Mr. Melendez's request by letter dated November 4, 2020. [*Id.*]. The parties and the Court agree that Defendant exhausted his administrative remedies under 18 U.S.C. § 3582(c)(1)(A), as over thirty days passed between the warden's receipt of the Defendant's request and the filing of his motion. *See* [Gov. Mem. in Opp'n at 3-4].

C. <u>Whether "extraordinary and compelling reasons" exist to warrant a sentence reduction</u>

Section 3582(c)(1)(A) does not define what constitutes "extraordinary and compelling reasons" and, under *Brooker*, district courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." 976 F.3d at 237. As an initial matter, "[t]he mere existence of COVID-19 in society and the possibility that it might spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Velez*, No. 3:17-CR-00150 (VAB), 2021 WL 837419, at *4 (D. Conn. Mar. 5, 2021)(collecting cases).

This Court and others have held that prevention from infection for an inmate

with an especially heightened risk of contracting the virus and developing severe complications based on their medical history may constitute "extraordinary and compelling" reasons to grant compassionate release, often in combination with other factors. *See, e.g. United States v. Jepsen*, 451 F. Supp. 3d 242, 245-47 (D. Conn. 2020) (granting consent motion for compassionate release where defendant suffers from a compromised immune system and defendant had less than eight weeks remaining on sentence); *United States v. Miller*, No. 3:15-CR-132-2 (VLB), 2020 WL 3187348, at *5 (D. Conn. June 15, 2020)(granting consent motion for compassionate release for severely ill defendant with less than three months remaining on sentence).

Courts considering defendants' medical vulnerability from COVID-19 ordinarily look to the CDC's guidance on at-risk health populations. *See United States v. Rivera*, No. 3:13-CR-71-1 (VLB), 2020 WL 3186539, at *4-5 (D. Conn. June 15, 2020); *see also, e.g., United States v. Adams*, No. 3:16-CR-86-VLB, 2020 WL 3026458, at *2 (D. Conn. June 4, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020).

In determining whether a defendant's medical vulnerability to the virus constitutes "extraordinary and compelling" reasons for re-sentencing, courts have considered a multitude of factors in factually intensive inquiries, including: defendants' age, the severity and documented history of their health conditions, defendants' history of managing those conditions in prison, the proliferation and status of infection at defendants' facilities, and the proportion of the term of incarceration that has been served. *United States v. Brady*, No. S2 18-CR-316

10

(PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020)(citations omitted).

Mr. Melendez is 42 years old, so his age is not a particular risk factor for severe illness. [PSR at 1 (date of birth)]; *Older Adults*, Ctrs. for Disease Control and Prevention, www.cdc.gov/coronavirus/2019-ncov/need-extra precautions/older-adults.html (last updated Apr. 16, 2021) (8 out of 10 COVID-19 deaths reported in the U.S. have been in adults 65 years old and older). Mr. Melendez's medical records confirm that he is diagnosed with and is being treated for mild hypertension. *See* [Dkt. 104 (Sealed Med. R.) at 2, 7] (indicating weekly blood pressure measurements); [*Id.* at 55-58 (01/17/2021 Hypertension Chronic Care Plan)](indicating that hypertension was mild). He was able to continue to engage in activities of daily living. *See* [Sealed Med. R. at 107 (01/21/2021 Behavioral Health Progress Note)].

The CDC considers hypertension as a condition that might increase a patient's risk for severe illness from COVID-19. *People with certain medical conditions*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, (last updated Apr. 29, 2021) ("Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and *possibly high blood pressure (hypertension)* can make you more likely to get severely ill from COVID-19") (emphasis added). In the table of supporting evidence linked to the CDC's updated conditions list, the CDC indicates that its conclusions about hypertension are "supported by mixed evidence." *See Science Brief: Evidence used to update the list of underlying medical conditions that increase a person's*

*risk of severe illness from COVID-19*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/underlying-evidence-table.html, (last updated Mar. 29, 2021). The CDC does not recognize post-polio syndrome or mobility difficulties as conditions correlating to an increased risk of severe illness from COVID-19. Thus, while Mr. Melendez might have some elevated risk of complications for COVID-19 because of his hypertension, he does not have any definitive risk factors and his condition is fairly well managed. *See United States, v. Lee Ferguson*, No. 3:19CR173 (MPS), 2021 WL 1105228, at *2 (D. Conn. Mar. 23, 2021)("While Ferguson may face an increased risk from COVID-19 under the CDC guidelines due to his age, high blood pressure, other medical conditions and confinement, his risk is not further heightened by serious risk factors that the CDC has recognized, such as obesity, severe asthma, and the like.")(footnote omitted).

Mr. Melendez also cites racial disparities in infection and mortality rates from COVID-19. [Def. Suppl. Mem. at 10]. He identifies as Hispanic and the Court notes that he is a Peruvian citizen. [*Id.*]; [PSR at 1]. The article Defendant cites postulates that the increased risk minorities face can be attributed to higher rates of minorities working during the pandemic, lack of access to healthy food options, systemic discrimination in housing, and higher rates of comorbidities. Richard A. Oppel, Jr. *et, al., The Fullest Look Yet at the Racial Inequality of Coronavirus*, New York Times (July 5, 2020), https://www.nytimes.com/interactive/2020/07/05/us/coronavirus-latinos-african-americans-cdc-data.html. While Mr. Melendez is incarcerated, some of these variables do not apply. Further, as stated above, he has not established

that he has a definitive comorbidity.  The reference to his race as putting him at an increased risk of serious illness and death is unpersuasive.  This Court considered this article and reached the same conclusion in *United States v. Gineyard*, No. 3:19-CR-144-VLB-16, 2021 WL 531969, at *4 (D. Conn. Feb. 12, 2021).

The Court also considers the status of the virus at Defendant's place of incarceration, which is now CI Giles W. Dalby.  At present, there are no active COVID-19 cases among inmates, 97 inmates have recovered from the virus, and three inmates died. *COVID-19 Dashboard*, Bureau of Prisons, https://www.bop.gov/coronavirus/, (last updated May 6, 2021).  The prison houses over 1700 offenders, so the overall incident rate remains low and appears well controlled. *CI Giles W. Dalby*, Bureau of Prisons, https://www.bop.gov/locations/ci/dal/ (last accessed May 6, 2021).  If prison employees are failing to abide by safety precautions, Mr. Melendez could file an inmate request pursuant to the BOP's Administrative Remedy Program. *See* 28 C.F.R. § 542.10(a)-(b).  Doing so would alert the appropriate officials to policy violations and allow them an opportunity to correct it for the safety of all inmates and staff.

Additionally, as the Government notes, the BOP is currently administering vaccinations. [Gov. Mem. in Opp'n at 8].  At present, the BOP has administered over 160,000 doses of the vaccine. *COVID-19 Dashboard,* Bureau of Prisons.  While Mr. Melendez's medical records do not reflect that he has been offered a COVID-19 vaccine yet, given the pace of distribution, it appears likely that he will receive one soon, if he has not been offered one already. See *Gineyard*, 2021 WL 531969, at *4.

Additionally, he will almost certainly be fully vaccinated before his custodial sentence ends.

Finally, the Court considers Mr. Melendez's claim that he has been rehabilitated in prison. By statute, "[r]ehabilitation ... alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). The Court has reviewed Mr. Melendez's letter and his subsequent affidavit whereby he professes to now empathize with his victims. [Dkt. 105-6, Def. Ex. H (Melendez ltr.)]. The Court is skeptical of Mr. Melendez's claim. His statements demonstrate that he continues to focus on the effect incarceration has had on him and his family while minimizing his own conduct.

In the letter he states, that "I fully regret not showing full remorse towards the victims … I feel awful, shame and total humiliation for putting my family through the embarrassment and heartache." [*Id.* at 1]. Mr. Melendez is saying that he regrets his statements at sentencing, not that he now understands the lifetime of trauma inflicted on victims of child sexual abuse. Mr. Melendez continues to minimize his offense: "I'm sorry for wasting the Court's time when there are worse criminals out there to deal with. I understand why Your Honor handed my the sentence you did. (sic). Some may say I deserve it." [*Id.* at 2]. After ten years of incarceration, Mr. Melendez has not yet appreciated the full scope of the harm he caused.

To Mr. Melendez's credit, he has engaged in available educational programing, including a GED course. *See* [Dkt. 105-5, Def. Ex. F. (Institutional R.)]. There is a notation from a mental health provider in the sealed medical records indicating that Mr. Melendez read over 400 books while in custody. [Sealed Med. R.

at 113 (12/22/2020 Mental Health Note)]. While Mr. Melendez's efforts at rehabilitation and self-improvement are commendable, they do not constitute extraordinary and compelling reasons to modify his sentence. As the Court noted in its decision denying his initial First Step Act motion in 2017, the BOP is in the best position to reward him for his behavior. *Supra*. 4. Indeed, the BOP has awarded him over two years of goodtime credit; absent good time credit he would not be released until November 20, 2024. [Def. Ex. F at 1 (BOP Sent. Computation)].

The case is distinguishable from cases where defendants established extraordinary rehabilitation, among other extraordinary and compelling circumstances. For example, in *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020), the district court granted a sentence reduction for a defendant, who was also medically vulnerable to COVID-19, and filed letters of support from 27 members of the prison staff attesting to defendant's exceptional character, showing that he used his time in "prison not just to better himself but also to better his community." Similarly, in *United States v. Lizardi*, 2020 U.S. Dist. LEXIS 188147, *7 (S.D.N.Y. Oct. 9, 2020), the district court characterized the case as 'unusual' because the defendant renounced his gang affiliation years before sentencing and had, effectively, five months remaining on his custodial sentence before being placed in a half-way house.

Consequently, the Court finds that Mr. Melendez fails to carry his burden of establishing that extraordinary and compelling reasons exist to modify his sentence. In sum, the Defendant has a relatively well-controlled medical condition that might place him at risk of severe complications from COVID-19. There are no

15

active cases at his place of confinement and fewer cases there historically than the average BOP facility, meaning that prison officials have demonstrated their ability to prevent an outbreak there. Mr. Melendez will likely have access to a vaccine soon if he has not already. Finally, while Defendant engaged in demonstrative self-improvement, the Court is skeptical of his claim of remorsefulness and his rehabilitation is insufficient itself to warrant any modification of his sentence beyond good time credits already bestowed by the BOP.

### § 3553 Sentencing Factors

Because the Court concludes that Mr. Melendez did not carry his burden of establishing "extraordinary and compelling" reasons to modify his sentence, the Court will only briefly discuss why the § 3553(a) sentencing factors further militate against granting Mr. Melendez's motion for compassionate release. The outcome of the Court's consideration of the § 3553(a) sentencing factors remains unchanged since sentencing.

First, the sentence in this matter reflected the seriousness of the offense. Mr. Melendez engaged in the proliferation of sadistic child pornography over a period of two to five years. [PSR ¶ 13]. Rather than a passive consumer, Mr. Melendez packaged contraband in a manner to make it more attractive to expand his own collection. His conduct was exploitative, and he failed to appreciate its devastating impact. Even now, his letter to the Court expresses regret, not remorse.

His anticipated deportation to Peru does not alter the Court's conclusion that early release would not comport with the purposes of sentencing. He committed his offense using home computers and his victims could be anywhere in the world.

16

He could commit similar offenses against U.S. children while living in Peru, especially without the watchful eye and supportive guidance of the U.S. Probation Office. *See United States v. Cremer*, No. 12 CR. 473 (ER), 2020 WL 4746569, at *6, n. 10 (S.D.N.Y. Aug. 17, 2020), *reconsideration denied*, No. 12 CRIM. 473 (ER), 2021 WL 75126 (S.D.N.Y. Jan. 8, 2021) (finding that anticipated deportation does not weigh in favor of early release of defendant convicted of receipt of child pornography because the defendant will not be supervised by probation if deported). By Mr. Melendez's own account, he has not received sex offender treatment. While his inability to access these programs may (or may not) be the result of circumstances beyond his control, he remains a danger to the public nonetheless.

A sentence of time served or a reduction of his sentence to some other degree would not promote respect for the law or provide just punishment for the offense, considering his circumstances now and at sentencing. Instead, it would signal to Mr. Melendez and others that they may evade responsibility by invoking temporary hardships attendant to incarceration during the pandemic. While Mr. Melendez has made some strides by engaging in available BOP programing and interacting appropriately with staff and other inmates, warranting transfer to a low security facility, his modest rehabilitation is outweighed by the other policy considerations embodied in § 3553(a). There is no evidence that Mr. Melendez has been denied appropriate medical or mental health treatment. To the contrary, his health is closely monitored by correctional staff.

The Court sympathizes with the hardships Mr. Melendez undoubtedly

experienced because of his incarceration during the pandemic, particularly given his mobility difficulties and health conditions. Nevertheless, after considering these circumstances and considering each of the § 3553(a) factors, the Court cannot conclude that the remaining portion of his custodial sentence is futile. Therefore, even if extraordinary and compelling reasons for a sentence modification existed, there is no sentence modification that would comport with the purpose of sentencing as set forth in § 3553(a).

## Conclusion

For the above stated reasons, the Court DENIES Mr. Melendez's motions for a reduction of his sentence to provide for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this day in Hartford, Connecticut: May 6, 2021